UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Zabdiel Yara, *pro se*,                                 :
                                                        :
                                Petitioner,             :
                                                        :   **MEMORANDUM AND ORDER**
                -against-                               :
                                                        :   06-CV-3399 (DLI)
Robert Ercole, Superintendent,                          :
Green Haven Correctional Facility,                      :
                                                        :
                                Respondent.             :
--------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

On October 16, 2002, Zabdiel Yara ("petitioner") was convicted in New York State Supreme

Court, Kings County, of murder in the first degree and arson in the fourth degree and sentenced to

consecutive prison terms of twenty-five-years-to-life for the murder and one-and-one-third-to-four-

years for the arson. The Appellate Division, Second Department, affirmed petitioner's conviction

in a decision dated November 22, 2004, *People v. Yara*, 12 A.D.3d 626 (2d Dep't 2004), and the

New York Court of Appeals denied petitioner leave to appeal on February 22, 2005, *People v. Yara*,

4 N.Y.3d 804 (2005). Petitioner did not seek a writ of certiorari from the Supreme Court of the

United States. Petitioner challenges his conviction through the instant petition for a writ of habeas

corpus, pursuant to 28 U.S.C. § 2254, on the grounds that the prosecution failed to prove his guilt

beyond a reasonable doubt at trial and that the jury's verdict was against the weight of the evidence.

For the reasons set forth below, the petition is denied.

**Summary of Facts**

A.     Petitioner's Trial, Conviction, and Sentence

Between 8:30 and 9:30 a.m. on January 13, 2000, nineteen-year-old Erica Alvarez and her two young children, Demaurys and Yafresy, were murdered inside their basement apartment on 164 Atkins Avenue in Brooklyn. The perpetrator entered the apartment without using force, stabbed Erica and both children multiple times, bound and gagged them, placed their bodies on a bed in Erica's room, set the bed on fire, and left the apartment. (Tr. at 182-88, 247-50.)[1] A ten-month-long police investigation culminated in the arrest of petitioner, Erica's upstairs neighbor and former boyfriend, on November 13, 2000. (*Id*. at 870-71.) On January 19, 2001, petitioner was indicted on three counts of murder in the first degree, six counts of murder in the second degree, and one count of arson in the fourth degree. (Resp. Ex. B at 1); *see People v. Yara*, Ind. No. 9479/00, 2002 WL 31627019 (N.Y. Sup. Ct. Nov. 6, 2000).

At the trial, a number of witnesses testified about the relationship between petitioner and Erica Alvarez. Jose Rodriguez Jr., Erica's brother, testified that petitioner confronted Erica on the street in December of 1999 and asked if he was the father of Erica's youngest child, Yafresy, to which Erica responded, "I don't want to talk to you" and "No, that's not your baby." (Tr. at 743-48.) A man named Tomas Rondon ("Rondon") testified that after meeting Erica on December 24, 1999, he began seeing her regularly in the weeks preceding the murder. (Tr. at 778-81.) Erica's mother, Ana Rodriguez, testified that petitioner spoke to her approximately a week before the murders about his desire to "go back with" Erica. (*Id*. at 669-70.)

---

[1] "Tr." refers to the transcript of the jury trial held between September 30 and October 16, 2002.

Manuel Villot ("Villot"), a friend of petitioner's, testified that on the morning of January 11, 2000, two days before the murders, he and petitioner were in front of the building at 164 Atkins Avenue when petitioner observed Rondon's car parked across the street. (Tr. at 627-30; 782-83.) After noticing the car, petitioner knocked loudly on the door of Erica's apartment and demanded to be let in. (*Id*. at 630-36.) Petitioner continued knocking on the door and yelling for approximately fifteen minutes until the door opened. (*Id*. at 632.) According to Rondon, who was inside Erica's apartment, the knocking stopped momentarily when someone entered petitioner's apartment and Erica's phone rang but quickly resumed after no one answered Erica's phone. (*Id*. at 783-86.) Villot testified that Rondon eventually opened the door and blocked the entranceway but that petitioner, demanding to see the mother of his baby, stepped past Rondon and entered the apartment. (*Id*. at 633.) Rondon claimed petitioner was extremely angry, screaming at Erica, and asking her what Rondon was doing there. (*Id*. at 786-88.) Erica responded by telling petitioner to leave. (*Id*. at 788.) After petitioner left the apartment, Rondon telephoned his brother, drove to pick him up, then returned to the apartment to take Erica to work. (*Id*.)

Gerard Connell of Verizon Communications testified that petitioner's phone records showed, over the next two days, nineteen outgoing calls to Erica's home number, her pager, and the phone number of the "El Caridad" restaurant where Erica worked. (*Id*. at 505-08.) Neither petitioner's phone records, nor Erica's, indicated any incoming calls to petitioner's account from a number associated with Erica. (*Id*. at 503, 508, 510-11.) Mr. Connell also testified that Erica received a page from the El Caridad restaurant at 12:27 a.m on January 13, 2000, and that three minutes later, at 12:30 a.m., someone placed a call to that same number from the phone within petitioner's apartment and had a brief conversation. (*Id*. at 512-13).

Witnesses at trial presented conflicting evidence about petitioner's whereabouts on the morning of January 13, 2000, the day of the murders. Detective Anthony Viggiani testified that petitioner spoke with him for approximately three to four hours at the 75th precinct in Brooklyn on January 13. (*Id*. at 402.) During the interview, petitioner stated that between 11:00 p.m. on January 12 and 12:00 a.m. on January 13, he paged Erica from his apartment, she returned his call, and they had a conversation, each in their own apartment in the building at 164 Atkins Avenue. (*Id*. at 410.) Petitioner stated he then went with his friend Jerry Rivera ("Rivera") to eat at White Castle before spending the night at Rivera's house. (*Id*. at 412.) Petitioner told the detective he had planned on going with another friend to Connecticut on the morning of January 13 but returned to Atkins Avenue instead when his sister informed him that their building was on fire. (*Id*.) In statements given to Detective Daniel Powers on November 13 and 14, 2000, petitioner again claimed that he paged Erica the night before the murders, but stated that instead of returning his call, she came up to his apartment to speak with him in person and that while they were together in petitioner's apartment, Erica received a page, which she returned using petitioner's phone. (*Id*. at 277, 280-81.)

Petitioner's neighbor, Annette Thomas, testified that she saw petitioner standing outside 164 Atkins Avenue between 7:00 and 7:30 a.m on January 13, 2000, the morning of the murders. (*Id*. at 698-703.) Rivera was unavailable to testify at the trial but his mother, Marie Luiz Rivera testified that while she was in her bed, she saw her son return home at approximately 2:30 a.m. on January 13, 2000 and retire to his room. (*Id*. at 606-09.) She did not see or hear anyone else enter the house that night. (*Id*. at 606-09.) Mrs. Rivera woke the next morning around ten minutes before nine, spoke on the telephone, took a shower, dressed herself in her room, then went into her son's room at approximately 10:00 a.m., at least half an hour after the murders occurred, and saw petitioner

lying on the floor of the bedroom. (*Id*. at 612-22.) She testified that although she had not seen petitioner in the previous six to eight hours, she had not heard anyone enter the house that morning. (*Id*. at 613, 621.)

The prosecution also presented evidence about a watch Erica frequently wore. Erica's mother Ana Rodriguez testified that although the watch belonged to her, her daughter "loved it" and "liked to wear it all the time." (*Id*. at 672.) She remembered seeing her daughter wearing the watch at around 9:30 p.m. on January 12, 2000, the night before the murders. (*Id*.) Jose Rodriguez Sr., Erica's father, testified that in June of 2000, he and his wife were visiting the cemetery where Erica, Demaurys, and Yafresy were buried when they encountered petitioner, his aunt, and Rivera. (*Id*. at 762-64.) During this encounter, petitioner gave Erica's watch to Mr. Rodriguez and stated that he found the watch on the floor of the Rodriguez's apartment at 164 Atkins Avenue the day after Erica had been murdered. (*Id*. at 764-67.) Ana Rodriguez testified that the police did not allow the family to reenter their apartment until two days after the murders. (*Id*. at 679.) Both Jose and Ana Rodriguez stated that the watch looked clean, showed no signs of any burn marks, and was in good working condition. (*Id*. at 683, 767.)

Iluminado Colon ("Colon"), an inmate at the Brooklyn House of Detention where petitioner was held after his arrest, also testified at the trial. Colon claimed to have befriended petitioner while they were in custody together and testified that petitioner confessed to him and described in detail how and why he killed Erica and her children. (Tr. at 926-33.) In the course of his testimony, Colon also admitted his extensive criminal record. (*Id*. at 905-13, 951-55, 960-73.) The prosecution presented no forensic evidence linking petitioner to the crimes with which he was charged although

5

Detective Edwin LaTorres did testify that fire and water damage at the crime scene made such evidence difficult to obtain. (Ex. A-13 at 574-77.)

At the close of evidence, petitioner moved to dismiss all of the charges against him "on the grounds that the People have failed to prove each and every count beyond a reasonable doubt, as a matter of law." (Tr. at 1298.) The court denied the motion, finding that the evidence was sufficient to submit the counts to the jury. (*Id*. at 1299.) On October 16, 2002, the jury convicted petitioner of one count of murder in the first degree and one count of arson in the fourth degree. (*Id*. at 1559.) Petitioner was sentenced on November 15, 2002. (Sent. at 1-28.)[2] At the sentencing hearing, petitioner's counsel moved orally "to set aside the verdict on the grounds that it was against the weight of the evidence." (*Id*. at 5.) The court noted that such a motion needed to be in writing, but nevertheless held that "on the basis of the grounds that the counsel now asserts, that motion is denied." (*Id*. at 7.) The court sentenced petitioner to consecutive prison terms of twenty-five-years-to-life for the murder and one-and-one-third-to-four-years for the arson and recommended that petitioner not be considered for parole until he had served at least thirty-five years. (*Id*. at 26.)

B.      Appeals and the Instant Petition

On April 4, 2004, petitioner appealed his conviction, arguing that the prosecution failed to prove his guilt beyond a reasonable doubt and that the verdict was against the weight of the evidence because the only evidence directly implicating petitioner came from Colon, "a jailhouse informant who had in the past repeatedly lied to law enforcement officials to avoid incarceration, and whose account of the crime as allegedly told to him by [petitioner] was inconsistent with the forensic and other key evidence." (Resp. Ex. B. at 26-39.) In a decision dated November 22, 2004, the Appellate

---

[2] "Sent." refers to the transcript of the sentencing hearing held on November 15, 2002.

Division affirmed petitioner's conviction, holding that the "challenge to the legal sufficiency of the evidence [was] unpreserved for appellate review" and that "[i]n any event, viewing the evidence in the light most favorable to the prosecution, . . . it was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt." *Yara*, 12 A.D.3d at 626 (citing, *inter alia*, N.Y. Crim. P. Law § 470.05(2)). The court further stated that Colon's "criminal record and history of drug use did not render his testimony incredible as a matter of law." *Id*. at 626-27 (citation omitted). Thereafter, petitioner timely applied for permission to appeal to the New York Court of Appeals and submitted a memorandum raising the same arguments that were presented to the Appellate Division. (Resp. Ex. D.) On February 22, 2005, the New York Court of Appeals denied petitioner leave to appeal, holding "there [was] no question of law presented that ought to be reviewed." (Resp. Ex. D); *Yara*, 4 N.Y.3d 804. Petitioner did not seek a writ of certiorari from the United States Supreme Court.

On May 17, 2006, petitioner, proceeding *pro se*, brought the instant petition for habeas relief in the United States District Court for the Southern District of New York. (ECF Docket Entry 4 pt. 3.) Judge Mukasey of the Southern District transferred the petition to this court on July 6, 2006 because petitioner's conviction occurred in Kings County. (*Id*. at pt. 4.) Respondent opposes the petition on the grounds that that: (1) petitioner's conviction is not amenable to federal habeas review because it fails to present a federal question; (2) petitioner's claims have been procedurally defaulted on an adequate and independent state ground; and (3) petitioner's claims do not warrant relief on the merits. (*Id*.)

7

**Discussion**

A.      Exhaustion and Timeliness

Section 2254(b)(1) requires that before seeking a writ of habeas corpus in federal court, a state prisoner must exhaust his state court remedies by giving the highest court of the state "a fair opportunity to pass on his federal claim." *Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citations omitted).  In New York, the exhaustion requirement is satisfied when a defendant, after appealing his conviction to the appropriate department of the Supreme Court's Appellate Division, seeks further review by applying to the Court of Appeals for a certificate granting leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005) (citing N.Y. Crim. Proc. Law § 460.20). Petitioner appealed his conviction to the Appellate Division and sought leave to appeal to the Court of Appeals.  The question petitioner asked New York's appellate courts to decide is identical to the one now posed to this court.  Petitioner thus exhausted his claims in state court.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further requires that a state prisoner seeking habeas relief in federal court must file his federal petition within one year of the state court decision becoming final.  28 U.S.C. § 2244(d)(1).  The Second Circuit has instructed "that the AEDPA limitations period specified in Section 2244(d)(1)(A) does not begin to run until the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or—if the prisoner elects not to file a petition for certiorari—the time to seek direct review via certiorari has expired." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  A party has ninety days to petition the Supreme Court for a writ of certiorari after the entry of a state court order denying discretionary review.  Sup. Ct. R. 13. Accordingly, AEDPA's one-year statute of limitations did not begin to run until May 23, 2005,

8

ninety days after the New York Court of Appeals declined to review petitioner's claims on February 22, 2005. Petitioner sought habeas review in the Southern District on May 17, 2006. The petition is timely.

B.    Independent and Adequate State Grounds

Respondent argues that petitioner's challenge to the legal sufficiency of the evidence is procedurally barred because the Appellate Division found it unpreserved for appellate review as a result of petitioner's failure to comply with New York's preservation rule, which requires defense counsel to contemporaneously object to any alleged legal error at a criminal trial. *See* N.Y. Crim Proc. Law § 470.05(2).[3] A federal habeas court will not consider a prisoner's claim if that claim was defaulted in state court on an adequate and independent state law ground. *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Federal habeas courts look to federal law to determine whether a state procedural bar precludes review of a federal question. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007).

---

[3]The statute reads as follows:

> For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

The Appellate Division's holding that petitioner's claim was unpreserved for appellate review constituted an "independent" ground of decision even though the court also discussed the merits of the underlying claim. *See Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) ("There is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground, even though the court spoke to the merits of [the] claim in an alternative holding.") (citing *Harris v. Reed*, 489 U.S. 255, 263 & n.10 (1989)). An independent state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state," but "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" *Garvey*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

The Second Circuit has found New York's contemporaneous objection rule to be firmly established and regularly followed by the New York courts. *Garcia*, 188 F.3d at 78-79. Therefore, whether the instant petition is procedurally barred by section 470.05(2) turns on whether it would be exorbitant to apply the rule in this particular case. *Garvey*, 485 F.3d at 713-14. Although not a formal test, in *Lee v. Kemna*, the Supreme Court provided several guideposts to help federal habeas courts determine whether the application of a firmly established and regularly followed state procedural rule would be exorbitant:

(1)     whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;

(2)     whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and

(3)     whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest.

10

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381-85).

Turning to the first *Lee* factor, the trial court clearly could not have relied on petitioner's violation of the contemporaneous objection rule—by definition, such a violation cannot occur until a party reaches the appellate court and attempts to raise an argument that has not been preserved. *See Garvey*, 485 F.3d at 719. The question remains, however, whether perfect compliance with the rule might have changed the trial court's decision. *Id*. At both the close of evidence and at sentencing, petitioner unsuccessfully moved the trial court to dismiss the charges against him because they were unsupported by the evidence. (Tr. 1298-99; Sent. 5-7.) These motions allowed the trial court to consider whether the evidence was legally sufficient as a general matter, but failed to apprise the court of petitioner's specific contention on appeal, namely, that the evidence was legally insufficient because Colon's testimony was incredible as a matter of law.

In *Cotto v. Herbert*, the Second Circuit found that perfect compliance with the contemporaneous objection rule probably would not have led the trial court to depart from its previous ruling that the petitioner, through his own misconduct, had forfeited his right to cross-examine a witness. 331 F.3d at 242-43. Nevertheless, the court opined that the petitioner might have persuaded the trial court to reach a different conclusion "[t]hrough argument, or perhaps a request for an opportunity to brief the issue." *Id*. at 243. The court thus found the situation distinct from and less favorable to the petitioner than that involved in *Lee,* where even perfect adherence to the relevant procedural rule would have failed to convince the trial judge to carry the trial over to another day because the judge had stated that personal obligations prevented him from granting a continuance. *Id*. at 243; *Lee*, 534 U.S. at 381. Recently, in *Garvey v. Duncan*, the Second Circuit found that "perfect compliance with [New York's contemporaneous objection] rule would have had

11

an impact on the trial court's decision" where the petitioner argued at trial that suggestive police conduct warranted suppression of identification testimony but did not present the trial court with his appellate claim that suggestive circumstances created by civilians also warranted suppression. 485 F.3d at 719.

The circumstances at bar seem comparable to those involved in *Cotto*. Even if petitioner had timely objected, argued, and briefed his contention that the prosecution's evidence was legally insufficient because it was based upon the testimony of Colon, the trial court most likely would not have changed its opinion that the verdict possessed sufficient evidentiary support. Nevertheless, unlike the situation in *Lee*, it is at least conceivable that perfect compliance with the procedural rule might have affected the ultimate outcome. Accordingly, the first *Lee* consideration provides no significant support for finding that this application of section 470.05(2) was exorbitant.

The second *Lee* factor directs the court to consider New York law and determine whether the contemporaneous objection rule is firmly established and regularly followed in the particular circumstances of petitioner's case, i.e., when defense counsel timely challenged a conviction based on the sufficiency of the evidence but failed to state specifically why the evidence was insufficient. *See Cotto*, 331 F.3d at 244. As a general matter, New York courts will not review unpreserved claims of legal insufficiency. *People v. Finger*, 95 N.Y.2d 894, 895 (2000); *People v. Gray*, 86 N.Y.2d 10, 19 (1995). Moreover, the New York Court of Appeals has consistently found that general objections to the sufficiency of the evidence fail to preserve specific sufficiency challenges later raised on appeal. *See, e.g.*, *Gray*, 86 N.Y.2d at 19 ("[E]ven where a motion to dismiss for insufficience of evidence was made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error."); *People v. Cona*, 49 N.Y.2d 26, 33 n.2 (1979) ("[T]he

failure to specify the lack of corroboration for [a witness's] testimony as a basis for the motion to dismiss the case [for insufficient evidence] . . . precludes later use of that motion as a vehicle for creating a question of law on this point."). Thus, the second consideration from *Lee* provides no support for finding that this application of New York's contemporaneous objection rule was exorbitant.

The final and "most important" consideration noted by the Supreme Court in *Lee* asks whether petitioner "substantially complied" with section 470.05(2) given the realities of trial. *Lee*, 534 U.S. at 382. Answering this question requires that the court consider the purpose underlying the procedural rule. In *Garvey*, the Second Circuit extensively reviewed New York statutory and case law and explained:

> [T]o preserve a claim of error . . . under § 470.05(2) a defendant must make his or her position known to the court. The purpose of this rule is to apprise the trial judge and the prosecutor of the nature and scope of the matter defendant contests, so that it may be dealt with at that time. A general objection is not sufficient to preserve an issue since such would not alert the court to defendant's position. Instead New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must specifically focus on the alleged error.

*Garvey*, 485 F.3d at 714 (collecting cases). Because petitioner only made a general objection to the legal sufficiency of the evidence and did not focus specifically on the alleged error—the testimony of Colon—petitioner did not substantially comply with section 470.05(2). Accordingly, the factors from *Lee* provide no support for finding the Appellate Division's application of the procedural rule exorbitant. *See Richardson*, 497 F.3d at 220 ("Where the case law interpreting New York's preservation rule in criminal proceedings displays consistent application in a context similar to the one before us, that rule is firmly established, regularly followed, and hence adequate for purposes of the independent and adequate state ground doctrine."). The court holds that New York's

preservation rule constituted an adequate ground of decision independent of petitioner's federal claim.

Even when habeas claims are barred by an adequate and independent state ground, a federal court can consider the claim despite the procedural bar if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The only cause for the default here was petitioner's trial counsel's failure to object, and default resulting from inadvertence or negligence is not considered "cause" for a default. *Id*. at 753. Petitioner is further unable to overcome the default by claiming a fundamental miscarriage of justice because he has failed to put forward any new evidence suggesting that he is innocent of the underlying crimes. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995).

C.     Petitioner's Claim

Although petitioner's request for habeas relief is denied on the basis of an independent and adequate procedural bar, the court notes that the underlying claim lacks merit under even a *de novo* standard of review. Petitioner's only claim is that his verdict stands against the weight of the evidence because the only direct evidence implicating petitioner was the testimony of Colon, who repeatedly had lied to law enforcement officials in the past and whose account of petitioner's description of the crimes contradicted other evidence in the record. (ECF Docket Entry 4 pt. 3 at 3.) The Due Process Clause of the Fourteenth Amendment prohibits criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing a state court conviction on these grounds, a federal habeas court considers "whether, after viewing the evidence in the light most favorable to the prosecution,

14

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A habeas petitioner challenging the legal sufficiency of the evidence in a state criminal conviction "bears a very heavy burden." *Spears v. Spitzer*, 02-CV-2301, 2005 WL 588238 at 11 (E.D.N.Y. March 14, 2005) (quoting *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir. 1997)).

When the challenge to the sufficiency of the evidence, as here, is based upon a witness's alleged lack of credibility, the petitioner's burden becomes insurmountable because section 2254 "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). The weight given to a witness's testimony is a question of fact to be determined by the jury, *Mason v. Brathwaite*, 432 U.S. 98, 116 (1977), and a district court sitting in habeas review must resolve all credibility issues in the verdict's favor and cannot second-guess the jury's determinations, *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993); *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.1989); *see Ayala v. Ercole*, 06-CV-1747, 2007 WL 1135560 at 8 (E.D.N.Y. Apr. 17, 2007) (collecting cases).

In addition to the testimony of Mr. Colon, which directly implicated petitioner, the prosecution provided an array of circumstantial evidence suggesting that petitioner had both motive and opportunity to commit the murders. Drawing all inferences in favor of the prosecution, as the court must, this evidence was plainly sufficient to allow a rational trier of fact to find petitioner guilty beyond a reasonable doubt of the crimes charged. *See Straus*, 999 F.2d at 696 ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence and the jury is exclusively responsible for determining a witness'[s] credibility.") (citations omitted).

Accordingly, petitioner's request for habeas relief fails on its merits even were it not procedurally barred.

**Conclusion**

For the reasons set forth above, the petition for a writ of habeas corpus is denied. Petitioner is further denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).


SO ORDERED.

DATED:     Brooklyn, New York
           March 26, 2008

_____/s/_____

DORA L. IRIZARRY
United States District Judge